1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  1:20-cv-00269-DAD-HBK

12              Plaintiff,

13        v.                               ORDER GRANTING IN PART AND
                                           DENYING IN PART PLAINTIFF'S MOTION
14   DIANE R. ALLISON, et al.,             FOR PARTIAL SUMMARY JUDGMENT

15              Defendants.                (Doc. No. 29)

16

17

18        Before the court is a motion for partial summary judgment filed by plaintiff, the United

19   States of America, to reduce to judgment unpaid estate taxes by defendant the Estate of Roger L.

20   Wilson, Sr. and to impose personal liability for the unpaid estate taxes on defendants Diane R.

21   Allison and Sonja R. Wilson.  (Doc. No. 29.)  Pursuant to General Order No. 617 addressing the

22   public health emergency posed by the COVID-19 pandemic, plaintiff's motion was taken under

23   submission on the papers.  (Doc. No. 30.)  For the reasons explained below, the court will grant in

24   part and deny in part plaintiff's motion.[1]

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
overwhelming caseload has been well publicized and the long-standing lack of judicial resources
in this district long-ago reached crisis proportion.  That situation has now been partially addressed
by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021.
Nonetheless, for over twenty-two months the undersigned was left presiding over approximately
1,300 civil cases and criminal matters involving 735 defendants.  Unfortunately, that situation

**BACKGROUND**

The parties have submitted a joint statement of stipulated facts and disputed issues in advance of plaintiff's motion for partial summary judgment.  (Doc. No. 27.)  The following is drawn from that joint statement or its exhibits.  Roger L. Wilson, Sr. (the "decedent") died on November 27, 2005.  (Doc. No. 27 at ¶ 4.)  Approximately two weeks before his death, on November 12, 2005, the decedent created a revocable *inter vivos* trust called the Roger L. Wilson Revocable Trust (the "trust").  (*Id.* at ¶ 5.)  Defendants Diane R. Allison and Sonja R. Wilson were and continue to be the two co-trustees of the trust.  (*Id.* at ¶ 6.)  Shortly before decedent's death, he transferred certain assets totaling $518,750 to the trust.  (*Id.* at ¶ 10.)

On or about February 27, 2007, defendants Allison and Wilson filed an estate tax return (Form 706) on behalf of defendant the Estate of Roger L. Wilson, Sr. (the "estate").  (Doc. No. 27 at ¶ 7.)  The estate tax return reported that the total gross estate value at the date of decedent's death was $1,663,242.  (*Id.* at ¶ 9.)  Presently, all the property of the trust and the estate has been transferred or distributed, and the tax liability reported on the estate tax return—amounting to $192,425—has been paid in full.  (*Id.* at ¶¶ 11–12; Doc. No. 27-1 at 1.)

Three years later, on or about February 9, 2010, defendants Allison and Wilson, acting as the estate's representatives and the trust's trustees, executed a Waiver of Restrictions on Assessments (Form 890) agreeing to an immediate assessment of $96,808 in additional tax on the estate (the "additional assessment").  (Doc. No. 27 at ¶ 13.)  Memorializing the additional assessment are three documents attached to the joint statement of stipulated facts:  the Report of Estate Tax Examination Changes (Form 1273); the Adjustments to Taxable Estate (Form 3228); and the Explanation of Items (Form 886A).  (Doc. No. 27-2.)  All but three of the adjustments made in the additional assessment have been agreed to by the parties.  (Doc. No. 27 at ¶ 17.)  Two of the disputed adjustments are placed at issue by plaintiff's pending motion for partial summary judgment:  (1) the inclusion of a $35,000 check made out to the Department of Child Support

_____

sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time.  This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

Services in the gross estate; and (2) the disallowance of $25,000 deduction from a settlement payment paid by the estate.  (*Id.*)

The first disputed adjustment concerns a $35,000 cashier's check that was purchased with funds withdrawn from the decedent's account on November 10, 2005.  (Doc. No. 27 at ¶ 18.)  The decedent intended the $35,000 cashier's check as a gift to decedent's son, Roger Wilson, Jr., to settle Mr. Wilson, Jr.'s debt for child support.  (*Id.* at ¶ 19.)  However, the payment was refused by the Department of Child Support Services and on March 13, 2006 the check was cancelled.  (*Id.*)  That same day, March 13, 2006, the estate issued a $29,000 check to the Department Child Support Services and a $6,000 check to Mr. Wilson, Jr. "to effectuate the gift." (*Id.* at ¶ 21.)  The parties disagree regarding whether the $35,000 total should or should not be included in the decedent's estate.  (*Id.* at ¶ 22.)

The second disputed adjustment concerns a $25,000 settlement payment stemming from a lawsuit filed in Fresno County Superior Court within a week of decedent's death.[2]  (Doc. No. 27 at ¶ 27.)  The lawsuit was initiated by Jannise Lazarus ("Jannise") and Ashli Tree-Ana Wilson-Bolton (a minor) ("Ashli") through her *guardian ad litem* Jannise against defendants Allison and Wilson as co-trustees of the trust.  (*Id.* at ¶ 27.)  The lawsuit sought to determine that certain real and personal property of the decedent's belonged to Jannise and Ashli and was not the property of the trust or decedent's estate.  (*Id.* at ¶ 28.)  On or about October 6, 2006, the parties settled the

_____

[2]  In connection with its motion, plaintiff requests that the court take judicial notice of the Fresno County Superior Court's docket in case number 06CEPR00326.  (Doc. Nos. 29 at 9 n.1; 29-1.) Under Federal Rule of Evidence 201(b), a court may take judicial notice of undisputed "matters of public record."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).  However, courts "cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed."  *Cal. Sportfishing Prot. Alliance v. Shiloh Grp.*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017).  Here, the court grants plaintiff's request for judicial notice of the state court docket attached to its motion (Doc. No. 29-1).  *See ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 756 n.1 (9th Cir. 2014) (finding that federal courts may take judicial notice of state court proceedings); *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (finding that federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue"); *E.I. Du Pont de Nemours & Co. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986) (taking judicial notice of a complaint filed in related state court action to ascertain the legal nature of the claims stated therein).

1  lawsuit and executed a mutual general release and settlement agreement.  (Doc. No. 27 at ¶ 29.)

2  Under that settlement agreement, which is attached to the joint statement of stipulated facts, (Doc.

3  No. 27-3), Ashli received $25,000 cash from the trust, among other property, that was sent

4  "directly to Jannise and Ashli's attorneys" and "used to pay Jannise and Ashli's attorney's fees."

5  (Doc. No. 27 at ¶¶ 30, 32.)  The parties disagree regarding whether the $25,000 is deductible from

6  the decedent's estate under 26 U.S.C. § 2053(a) and 26 C.F.R. § 20.2053-4.  (*Id.* at ¶ 33.)

7  **LEGAL STANDARD**

8  Summary judgment is appropriate when the moving party "shows that there is no genuine

9  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

10  Civ. P. 56(a).

11  In summary judgment practice, the moving party "initially bears the burden of proving the

12  absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

13  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

14  may accomplish this by "citing to particular parts of materials in the record, including

15  depositions, documents, electronically stored information, affidavits or declarations, stipulations

16  (including those made for purposes of the motion only), admissions, interrogatory answers, or

17  other materials," or by showing that such materials "do not establish the absence or presence of a

18  genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

19  Fed. R. Civ. P. 56(c)(1)(A), (B).

20  If the moving party meets its initial responsibility, the burden then shifts to the opposing

21  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

22  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

23  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

24  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

25  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

26  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

27  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

28  summary judgment.").  The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). When establishing the existence of a factual dispute, the opposing party need not resolve a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a motion for summary judgment.  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

### A.    The Estate's Tax Liability

"In an action to collect tax, the government bears the initial burden of proof.  The government can meet its burden by introducing a tax assessment." *Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1058 (9th Cir. 2021).  The government's "deficiency determinations and assessments for unpaid taxes" are presumed correct "so long as they are supported by a minimal

1    factual foundation." *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir. 2004); *see also United States v.*

2    *Stephens*, 185 F. Supp. 2d 1116, 1126 (E.D. Cal. 2001) ("An assessment of unpaid federal tax,

3    when supported by some positive evidence or properly certified, is presumptively correct

4    evidence of the taxpayer's liability and satisfies the government's burden of proof.").

5        "Introduction of the presumptively correct assessment shifts the burden of proof to the

6    taxpayer" to show that the assessment is incorrect. *United States v. Stonehill*, 702 F.2d 1288,

7    1294 (9th Cir. 1983); *see also United States v. Crisp*, 190 F.R.D. 546, 552 (E.D. Cal. 1999)

8    ("[T]he burden shifts to the taxpayer to show by a preponderance of the evidence that the

9    deficiency was arbitrary or erroneous.") (quoting *Hardy v. Comm'r*, 181 F.3d 1002, 1004 (9th

10   Cir.1999)).  "A showing by the taxpayer that [the government's] determination is arbitrary,

11   excessive or without foundation shifts the burden of proof back to the [government]" to prove the

12   correctness of the government's assessed deficiency. *Palmer v. U.S. I.R.S.*, 116 F.3d 1309, 1312

13   (9th Cir. 1997); *see also Stonehill*, 702 F.2d at 1294.  When "the taxpayer submits no evidence to

14   contradict or challenge the accuracy of the tax assessments, judgment must be entered for the

15   government." *Stephens*, 185 F. Supp. 2d at 1126 (citing *Koff v. United States*, 3 F.3d 1297, 1298

16   (9th Cir.1993)).

17       Here, the parties have stipulated that timely assessments were made against the estate for

18   unpaid federal estate taxes, penalties, interest, and "other statutory additions" in 2010, 2013, and

19   2017.  (Doc. No. 27 at ¶ 14.)  The documents relating to and supporting the additional assessment

20   of unpaid estate taxes—the Report of Estate Tax Examination Changes (Form 1273), the

21   Adjustments to Taxable Income (Form 3228), and the Explanation of Items (Form 886A)—were

22   attached as exhibits to the parties' joint statement of stipulated facts.  (Doc. Nos. 27 at ¶ 16; 27-

23   2.)  Together, Forms 1273, 3228, and 886A, reflect plaintiff's calculation of estate tax liability

24   and its explanation for the adjustments.  It is also stipulated that defendants Allison and Wilson,

25   acting as the estate's representatives and the trust's trustees, signed A Waiver of Restrictions on

26   Assessments (Form 890) agreeing to the additional assessment.  (Doc. No. 27 at ¶ 13.)  This

27   showing satisfies the minimal factual foundation necessary for plaintiff to be entitled to the

28   presumption of correctness.  *Olshan*, 356 F.3d at 1084.  Thus, the burden of proof shifts to the

1  defendants to show that the assessment was "arbitrary or erroneous."  *Crisp*, 190 F.R.D. at 552.

2       1.     <u>$35,000 Cashier's Check</u>

3  The federal estate tax imposes a tax "on the transfer of the taxable estate of every

4  decedent who is a citizen or resident of the United States."  26 U.S.C. § 2001(a).  The taxable

5  estate is defined as the gross estate less any deductions allowable under the Internal Revenue

6  Code.  26 U.S.C. § 2051.  The gross estate includes "the value of all property to the extent of the

7  interest therein of the decedent at the time of his death."  26 U.S.C. § 2033.  The Treasury

8  Regulations further explain what is included in the gross estate:  "[t]he amount of cash belonging

9  to the decedent at the date of his death, whether in his possession or in the possession of another,

10  or deposited with a bank, is included in the decedent's gross estate."  26 C.F.R. § 20.2031-5.

11  The parties dispute whether the $35,000 cashier's check should be included in the gross

12  estate.  The question as to if it should turns on whether the decedent still had an interest in the

13  cashier's check when he died on November 27, 2005.  *See Shackleford v. United States*, 262 F.3d

14  1028, 1031 (9th Cir. 2001) (citing 26 U.S.C. §§ 2031, 2033) ("The gross estate includes the total

15  '[v]alue at the time of his death of all property, real or personal, tangible or intangible, wherever

16  situated [,]' to the extent the decedent had an interest in the property."); *United States v. Paulson*,

17  331 F. Supp. 3d 1066, 1081 (S.D. Cal. 2018) (quoting *Est. of Tully*, 528 F.2d 1401, 1406 (Ct. Cl.

18  1976)) ("[26 U.S.C. § 2033] applies to situations where decedent kept so much control over an

19  item of property that in substance he still owns the property.").

20  "Whether decedent had an interest in property at the time of his death is governed by state

21  law."  *Est. of Gagliardi v. Comm'r*, 89 T.C. 1207, 1210 (1987); *see also Morgan v. Comm'r*, 309

22  US 78, 80 (1940) ("State law creates legal interests and rights. The federal revenue acts designate

23  what interests or rights, so created, shall be taxed."); *United States v. Irvine*, 511 U.S. 224, 238

24  (1994) ("[T]he general and longstanding rule in federal tax cases [is] that although state law

25  creates legal interests and rights in property, federal law determines whether and to what extent

26  those interests will be taxed.").  Under California law, if the cashier's check constituted a gift, the

27  decedent would no longer have an interest in it once given.  *See In re Marriage of Pashley*, 40

28  Cal. App. 3d 1079, 1083 (1974) ("[A] gift requires the present and complete divestment of the

1  subject property."); *Taylor v. Taylor*, 66 Cal. App. 2d 390, 399 (1944) ("A voluntary gift divests

2  the donor of his property and invests the donee with title irrevocably."); *Logan v. Ryan*, 68 Cal.

3  App. 448, 455 (1924) ("A gift vests the donee with the absolute property in the thing given, and it

4  is no longer subject to the control of the donor.").  Plaintiff contends, however, that the cashier's

5  check was an unsuccessful gift that failed before decedent's death because it was refused by the

6  recipient and cancelled.  (Doc. No. 29 at 6.)  Defendants counter that notwithstanding the refusal

7  and subsequent cancellation of the cashier's check, the reissuance of the cashier's check after

8  decedent's death constitutes a valid gift.  (Doc. No. 32 at 8.)

9       Under California law, there are three elements necessary for a valid gift:

10          (a) There must be an intent, on the part of a donor having capacity to
            contract, to make an unconditional gift. [Citation.] (b) There must be
11          an actual or symbolical delivery, such as to relinquish all control by
            the donor. [Citation.] (c) The donee must signify acceptance, except
12          where it may be presumed.

13  *Dudek v. Dudek*, 34 Cal. App. 5th 154, 165 (2019) (citing 13 Witkin, Summary of Cal. Law (10th

14  ed. 2005) Personal Property, § 134), *review denied* (July 10, 2019).  "[W]here a claim of gift is

15  asserted after the death of a donor, every element necessary to constitute a gift must be sustained

16  by explicit and convincing evidence."  *Bishop's Sch. Upon Scripps Found. v. Wells*, 19 Cal. App.

17  2d 141, 147 (1937).  Here, the first requirement—donative intent—has been stipulated to:  the

18  parties agree the decedent intended the $35,000 cashier's check as a gift to decedent's son, Mr.

19  Wilson Jr., to pay his child support debt.  (Doc. No. 27 at ¶ 19.)  The parties dispute whether there

20  was valid delivery and acceptance, (Doc. Nos. 29 at 8–9; 32 at 11–12), but the court need only

21  address the delivery element to resolve this issue.

22       The basic requirement of a valid delivery is that the donor give up dominion over the

23  property such that control passes to the donee or some third person not subject to the donor's

24  directions.  *See Beebe v. Coffin*, 153 Cal. 174, 176 (1908).  It is not always necessary that delivery

25  be "absolute or unconditional" to effectuate a gift because when "*the donor's acts unequivocally*

26  *show that it intended to divest itself of ownership in the property*, the gift will be upheld."

27  *Yamaha Corp. of Am. v. State Bd. of Equalization*, 73 Cal. App. 4th 338, 359 (1999) (citing

28  *Gordon v. Barr*, 13 Cal. 2d 596, 601–02 (1939)).  That said, "[t]he precaution of requiring an

1  unambiguous delivery is 'especially desirable when, as is frequently the case, the alleged donor is

2  dead at the time the claim is asserted'. . . ." *Id.*  When applying the delivery rule in the context of

3  personal checks, it is well established that a donor who intends to gift a personal check does not

4  effect its delivery, and thus the gift is not complete, until the check is cashed.  *See Edwards v.*

5  *Guar. Tr. & Sav. Bank*, 47 Cal. App. 86, 89 (1920) (finding that a personal check received as a

6  gift was invalid when it was not cashed before the donor's death even though the bank mistakenly

7  rejected the check while the donor was still alive); *Hyman v. Tarplee*, 64 Cal. App. 2d 805, 812

8  (1944) (citing *Coon v. Shry*, 209 Cal. 612, 614 (1930)) (recognizing that "the rule that a gift of the

9  donor's own note or check is not enforceable by the donee against the donor or his estate" is

10  "undoubtedly the law" because "it only amounts to a promise to make a gift in the future, and is

11  no more enforceable than any other promise to make a gift"); *Blonde v. Jenkins' Est.*, 131 Cal.

12  App. 2d 682, 686 (1955) ("If dominion and control over the gift is retained by the donor until his

13  death, it becomes merely an unexecuted and unenforceable promise to make a future gift.").

14  Mere physical possession of a personal check is thus insufficient to establish delivery because the

15  donor could stop payment at any moment.  *See Edwards*, 47 Cal. App. at 89; *Hyman*, 64 Cal.

16  App. 2d at 812.  As such, personal checks are regularly included in a decedent's gross estate

17  when they are found to be incomplete gifts due to the donee's failure to cash the check before the

18  decedent's death.  *See, e.g.*, *Est. of Gagliardi v. Comm'r*, 89 T.C. 1207, 1214 (1987) (holding

19  personal checks given before donor's death but not cashed until after donor's death were not

20  completed gifts under Pennsylvania law and thus were amounts properly included in the gross

21  estate); *McCarthy v. United States*, 806 F.2d 129, 131 (7th Cir. 1986) (holding same under

22  Illinois law); *Rosano v. United States*, 67 F. Supp. 2d 113, 120 (E.D.N.Y. 1999) (holding same

23  under New York law), *aff'd*, 245 F.3d 212 (2d Cir. 2001).

24       In contrast to a personal check, a cashier's check is "a draft with respect to which the

25  drawer and drawee are the same bank or branches of the same bank."  Cal. Com. Code § 3104(g).

26  A "draft" is an order to pay.  *Id.* § 3104(e).  The "drawer" is the "person who signs or is identified

27  in a draft as a person ordering payment" and the "drawee" is the "person ordered in a draft to

28  make payment."  *Id.* § 3103(a)(2), (3).  Thus, unlike with a personal check, a payee/holder of a

9

1  cashier's check has a right to payment from the issuing bank.[3]  *Id.* §§ 3301, 3412; *United States v.*

2  *Boren*, 278 F.3d 911, 916 (9th Cir. 2002) ("Unlike a personal check drawn by a depositor on his

3  own account, bank checks and cashier's checks carry the promise of the bank itself.").  There is

4  also no provision in the California Commercial Code allowing "a customer to place a stop-

5  payment on a cashier's check, (but there is no specific prohibition either)."  *Lee*, 179 B.R. at 159.

6       Due to these differences, "[i]t is well-established in California law that the purchaser of a

7  cashier's check retains a property interest in the cashier's check before it is delivered."  *Id.*; *see*

8  *also* Cal. Com. Code § 3203(a) ("An instrument is transferred when it is delivered by a person

9  other than its issuer for the purpose of giving to the person receiving delivery the right to enforce

10  the instrument.").  Delivery occurs when the cashier's check's intended recipient physically

11  receives the check from the purchaser.  *See Lee*, 179 B.R. at 165; *In re Mora*, 218 B.R. 71, 76

12  (B.A.P. 9th Cir. 1998) (holding that delivery of cashier's check did not occur when it was

13  deposited in the mail but rather when the cashier's check was in the physical possession or

14  control of the intended payee), *aff'd*, 199 F.3d 1024 (9th Cir. 1999) ("*In re Lee* equated the date

15  of delivery with the date the payee receives the cashier's check and obtains physical possession of

16  the instrument."); *cf. Field v. Shorb*, 99 Cal. 661, 663–64 (1893) (holding that a gift of a

17  certificate of deposit was established when it was endorsed by the donor and physically delivered

18  to the donee).  In *Lee*, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") explained its

19  reasoning for a physical delivery rule for cashier's checks:

20      Although a purchaser cannot stop payment of the cashier's check, he
    or she could return the cashier's check or seek to have it cancelled as

21      long as it is in his or her possession. Therefore, until delivery, the
    purchaser's property rights in the cashier's check are not transferred

22      to the payee/holder.

23  /////

24

25  ――――――――――――――――――
[3]  California's negotiable instruments provisions "are predicated on the rights of a holder."  *In re*

26  *Lee*, 179 B.R. 149, 161 n.12 (B.A.P. 9th Cir. 1995), *aff'd*, 108 F.3d 239 (9th Cir. 1997).  To be
the "holder" of an instrument—such as a cashier's check—means the person has possession of

27  the instrument and the instrument "is payable either to bearer or, to an identified person that is the
person in possession."  Cal. Com. Code § 1201(21)(A); *see also In re McMullen Oil Co.*, 251

28  B.R. 558, 566 (Bankr. C.D. Cal. 2000).

1   *Lee*, 179 B.R. at 161.[4]

2        Here, both parties cite the decision in *Lee* in support of their differing conclusions

3   regarding delivery of the $35,000 cashier's check.  (Doc. Nos. 29 at 7; 32 at 10.)  Having

4   reviewed the case closely, this court concludes that the court's reasoning in *Lee* regarding

5   cashier's checks is persuasive and applies it to the facts of this case to determine if the purchaser

6   of the cashier's check—the decedent—retained ownership over the cashier's check at his death

7   thereby invalidating his intended gift.[5]

8        In its motion, plaintiff contends the cashier's check is includable in the decedent's gross

9   estate because its intended recipient, the Department of Social Services, did not accept the

10  cashier's check; the cashier's check was returned to the estate; and the estate was able to cancel

11  the cashier's check on March 13, 2006.  (Doc. No. 29 at 7.)  Plaintiff thus concludes that the

12  _____

13  [4] For example, in *Lee*, the BAP confronted a situation in which a cashier's check was delivered
    during the course of a single month where the following occurred:  (1) on the 11th, a check was
    delivered to the payee; (2) on the 14th, the payee deposited the check; (3) on the 23rd, the bank

14  returned the check to the payee because it lacked a dual signature; and (4) on the 25th, a cashier's
    check was purchased and physically delivered to the payee.  *Id.* at 153.  The BAP concluded that

15  the 25th was the date the purchaser of the cashier's check no longer retained a property interest in

16  it.  *Lee*, 179 B.R. at 161–62.

17  [5] Although *Lee* was a bankruptcy case, the court there was attempting to determine *when* funds

18  were transferred from the debtor to a particular creditor because bankruptcy trustees can void so-
    called "preferential" transfers that occur within 90 days before a bankruptcy filing under 11

19  U.S.C. § 547.  *See Lee*, 179 B.R. at 161.  The court in *Lee* distinguished cashier's checks from
    personal checks, which binding precedent held were not deemed delivered until the date the check

20  was cashed—the same way personal checks are treated in the gift-giving context.  *Compare id.*
    *with Edwards*, 47 Cal. App. at 89.  There is further support for the proposition that there is not a

21  transfer of a property interest (and thus no valid gift) with a cashier's check unless it is physically
    delivered.  *See In re Lee*, 108 F.3d 239, 241 (9th Cir. 1997) (affirming the BAP's decision in *Lee*

22  and noting that "the transfer of property occurred upon delivery of the check"); In re *Mora*, 199
    F.3d 1024, 1028 (9th Cir. 1999) (following the BAP's reasoning in *Lee* and concluding that a

23  cashier's check is not delivered when placed in the mail because "[a] variety of mishaps could
    occur between the time of mailing and the time [the recipient] gains control over the check that

24  would frustrate delivery"); *see also Hyman*, 64 Cal. App. 2d at 812 (holding that when a personal

25  check is made out to the donor "title passes to the note or check upon physical delivery to the
    donee, even without endorsement"); *Pikeville Nat. Bank & Tr. Co. v. Shirley*, 135 S.W.2d 426,

26  431 (Ky. 1939) (holding that gift of cashier's check was only valid on physical delivery);

27  *Gillespie v. Riley Mgmt. Corp.*, 59 Ill. 2d 211, 217 (1974) ("[T]he purchaser of a cashier's check
    remains the 'owner' thereof until such time as he delivers or negotiates it to the payee. Until such

28  delivery, the purchaser retains the right to cancel.").

1   cashier's check remained the estate's property and in its control both before and after decedent's

2   death.  (*Id.* at 8.)  In particular, plaintiff asserts that because the estate exercised its "dominion and

3   control" over the cashier's check by cancelling it and reissuing two separate checks after

4   decedent's death, it must be included in the gross estate.  (Doc. No. 33 at 3.)

5          In opposition, defendants make the following contentions in their brief, all without any

6   citations to supporting declarations or other documents.[6]  Defendants claim that "[t]here is no

7   dispute that the [cashier's] check was given to Roger Wilson, Jr., which proves successful

8   delivery and acceptance."  (*Id.* at 9.)  Plaintiff also claims the check was "hand-delivered to the

9   Department of Child Support Services" by Mr. Wilson, Jr. and defendant Wilson.  (*Id.* at 2, 9.)

10  Moreover, after the alleged hand-delivery, the cashier's check was apparently "lost . . . inside the

11  Department of Child Support Services' building" and months later Mr. Wilson Jr.'s case manager

12  contacted Mr. Wilson Jr. offering to settle his child support debt for $29,000 instead of $35,000.[7]

13  (*Id.* at 2.)  As a result, the estate issued two new checks on March 13, 2006:  the first for $29,000

14  to the Department of Child Support Services; the second for $6,000 to Mr. Wilson Jr.  (*Id.* at 9.)

15  Although defendants repeatedly assert that "[t]here is no dispute that the check was given to

16  Roger Wilson, Jr." or that Mr. Wilson, Jr. "had possession of the cashier's check," there are no

17  citations or support for these assertions in the record before this court.  (*Id.* at 9, 11.)

18         The joint statement of stipulated facts state the following regarding the cashier's check:

19             18. On November 10, 2005, $35,000 was withdrawn from the
                Decedent's account at So-Val Federal Credit Union and cashier's
20             check #050951 was purchased (the Cashier's Check).

21  /////

---

22  [6]  Although defendants attach exhibits 1–10 to their opposition brief, none of those documents
23  support these contentions.

24  [7]  In addition to contending that the cashier's check was "lost," defendants claim the Department
     of Child Support Services "did not return [the cashier's check]."  (Doc. No. 32 at 9–10.)
25   However, defendants have attached to their motion a copy of the original cashier's check and it is
     undisputed that it was cancelled (which requires possession under *Lee*, 179 B.R. at 161) on March
26   13, 2006.  (Doc. Nos. 32-1 at 2; 27 at ¶ 20.)  Thus, defendants' assertions are inconsistent—
     asserting both that the check was "lost" and "not return[ed]" but also attaching a copy of the
27   check to defendants' motion with the words "cancel" and "cancel 3/13/06" written on it.  (Doc.
     No. 32-1 at 2.)
28

12

19. The Decedent intended the $35,000 as a gift to the Decedent's son Roger Wilson, Jr. to settle Roger Wilson, Jr's debt for child support.

20. The payment was refused by the Child Support Services and on March 13, 2006, the Cashier's Check was cancelled.

21. On March 13, 2006 the Estate issued a $29,000 check to Child Support Services and a $6,000 check to Roger Wilson, Jr. to effectuate the gift.

22. The parties **disagree** whether the $35,000 should or should not be included in the Decedent's estate.

(Doc. No. 27 at ¶¶ 18–22.)

Here, the stipulated facts establish that the cashier's check was "refused" by the Department of Child Support Services, its intended recipient,[8] showing that any attempted delivery was rejected.[9]   The cashier's check was also cancelled on March 13, 2006, which is well after decedent's death on November 27, 2005, suggesting that physical delivery never occurred prior to decedent's death.  *See Lee*, 179 B.R. at 161 ("Although a purchaser cannot stop payment of the cashier's check, he or she could return the cashier's check or seek to have it cancelled *as long as it is in his or her possession*.") (emphasis added).  Finally, the estate re-issued two new checks in amounts and to recipients that differed from what the decedent appears to have originally intended.  These undisputed facts—refusal, cancellation, and reissuance—all indicate that physical delivery of the $35,000 cashier's check did not occur before the decedent's death. *Cf. Yamaha*, 73 Cal. App. 4th at 358 (quotation omitted) ("The purpose of requiring some specific form of delivery . . . is to protect the property of the individual from ill-founded and fraudulent claims of gift by requiring strong concrete evidence that he [or she] really intended to part with [the] property.").

/////

---

[8]  In the pay to the order of line it states, "DEPT. OF CHILD SUPPORT SERVICES" and includes "RE: ROGER L WILSON" immediately below.  (Doc. No. 32-1 at 2.)

[9]  The court need not reach the question of valid acceptance but does question how acceptance could be completed when it is stipulated by the parties that the intended recipient "refused" the cashier's check.  *See Refuse*, Merriam-Webster, merriam-webster.com/dictionary/refuse (last visited on Dec. 8, 2021) ("to express oneself as unwilling to accept").

1   Defendants have also failed to establish that a genuine issue as to any material fact existed

2   regarding when the cashier's check was delivered.  (*See* Doc. No. 32 at 8–12.)  Although

3   defendants have presented numerous factual assertions in the body of their opposition brief, they

4   have failed to support those assertions by "citing to particular parts of materials in the record" or

5   tendering any evidence of the specific facts regarding the $35,000 cashier's check.[10]  Fed. R. Civ.

6   P 56(c)(1).  Indeed, defendants' failure to present or point to evidence in this regard suggests that

7   the cashier's check was never delivered before the decedent's death.  As a result, not only have

8   defendants failed to present evidence of a disputed material fact but they also failed to overcome

9   the presumption of correctness regarding the plaintiff's tax assessment that the $35,000 cashier's

10   check should be included in the gross estate.  Summary judgment in favor of plaintiff must

11   therefore be granted.  *See Celotex*, 477 U.S. at 322 (finding that summary judgment should be

12   entered against a party who fails to make a showing sufficient to establish the existence of an

13   element essential to that party's case, and on which that party will bear the burden of proof at

14   trial); *Stephens*, 185 F. Supp. 2d at 1126 ("[When] the taxpayer submits no evidence to contradict

15   or challenge the accuracy of the tax assessments, judgment must be entered for the

16   government.").

17   There is simply no evidence before the court on summary judgment showing that physical

18   delivery of the $35,000 cashier's check to its intended recipient occurred before decedent's death.

19   Given defendants' failure to present any such evidence, the court concludes that the decedent

20   retained a property interest in the cashier's check when he died and that the $35,000 must be

21   included in his gross estate.

22   ───────────────

23   [10]  The only evidence included in defendants' opposition relevant to the delivery of the cashier's check is a copy of the original cashier's check.  (Doc. No. 32-1 at 2, 49.)  This exhibit shows that the defendants—not Mr. Wilson, Jr. or the Department of Child Support Services—have been in

24   possession of the cashier's check.  (*Id.*)  The cashier's check evidences that it was cancelled because the words "cancel" and "cancel 3/13/06" appear handwritten on its face.  (*Id.*)  The

25   defendants also have included a one-page bank statement showing that the $35,000 was disbursed from decedent's bank account on November 10, 2005.  (*Id.*)  But both the copy of the cashier's

26   check and the bank statement do not add anything to the factual record on summary judgment

27   because the date the cashier's check was cancelled and the date and amount in which the cashier's check was purchased were already established in the parties' joint statement of stipulated facts.

28   (Doc. No. 27 at ¶¶ 18, 20.)

2.      $25,000 Settlement Payment

"To determine the value of the taxable estate, the gross estate is reduced by any deductions allowable under the Internal Revenue Code." *Est. of Saunders v. Comm'r*, 745 F.3d 953, 957 (9th Cir. 2014) (citing 26 U.S.C. § 2053). "Claims against the estate are one type of deduction allowable under the Internal Revenue Code." *Id.*; 26 U.S.C. § 2053(a)(3) ("[T]he value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts . . . for claims against the estate. . . ."). Treasury Regulations in effect when the decedent died further clarify the deductibility of claims against the estate:[11] "The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, and interest thereon which had accrued at the time of death." 26 C.F.R. § 20.2053-4.

Claims against the estate are distinguished from claims to a portion of the estate; the former are deductible under 26 U.S.C. § 2053(a)(3) while the latter are not. *See Est. of Lazar v. Comm'r*, 58 T.C. 543, 552 (1972) ("[A] claim to share in the estate . . . is to a distributive interest in the estate, not a claim against the estate within the meaning of section 2053(a)(3), and as such would not be deductible from the gross estate."); *Lindberg v. United States*, 927 F. Supp. 1401, 1404 (D. Colo. 1996) ("The pertinent question for the Estate's attempt to deduct the Settlement payment pursuant to 26 U.S.C. § 2053(a)(3) is whether the payment represents a deductible claim by a creditor 'against the estate' or a non-deductible claim by a descendant for a 'portion of the estate.'"), *aff'd*, 164 F.3d 1312 (10th Cir. 1999). Critical to this distinction is the status of the claimant. *See Lindberg v. United States*, 164 F.3d 1312, 1318–19 (10th Cir. 1999) ("I.R.C. § 2053 and Treas. Reg. § 20.2053–4 'permit deduction for claims based on personal obligations of the decedent, not for payment to an heir claiming as such. *The status of the claimant* is the determinative factor. . . .'"). In attempting to distinguish deductible from non-deductible claims,

> the federal estate tax requires that courts look beneath the surface of
> transactions to discover the essential character of each transfer. Even

---

[11] The current Treasury Regulations in effect do not apply here because the decedent died on November 27, 2005. *See* 26 C.F.R. § 20.2053-4(f) ("This section applies to the estates of decedents dying on or after October 20, 2009.").

1

2

3

> where a claim is ultimately satisfied by the operation of law, the courts will determine the nature of the claim for federal tax purposes by examining the particular status of the claimant that enabled him to impose his claim on the estate.

4

*Bank of New York v. United States*, 526 F.2d 1012, 1017 (3d Cir. 1975).  Finally, when the "claim

5

[is] founded upon a promise or agreement [it] is limited to the extent that the liability was

6

contracted *bona fide* and for an adequate and full consideration in money or money's worth."  26

7

C.F.R. § 20.2053-4; *see also* 26 U.S.C. § 2053(c)(1)(A).

8

In its pending motion, plaintiff argues that the $25,000 payment to Ashli settled her claim

9

that she, rather than the trust or estate, held title to certain real and personal property.  (Doc. No.

10

29 at 11.)  More specifically, plaintiff avers that Ashli's lawsuit did not seek to recover a personal

11

obligation of the decedent in tort or contract, but instead sought a declaratory judgment as to the

12

extent of the estate's property and that her lawsuit would not trigger the no-contest clause of the

13

trust.  (*Id.* at 12.)  Plaintiff further maintains that Ashli's status as a beneficiary of the trust is

14

"significant" because it shows that Ashli's lawsuit was "a claim *to* a portion of the estate, not a

15

claim *against* the estate."  (*Id.* at 12–13.)  In opposition, defendants argue that "[t]he basis of the

16

claim was alleged oral agreements between Decedent and Jannise" so the claim was "for breach

17

of contract" and is thus deductible.[12]  (Doc. No. 32 at 13.)

18

Having reviewed the parties' joint statement of stipulated facts and the attachments

19

thereto, the state court docket attached to plaintiff's motion, and the exhibits attached to

20

defendants' opposition, this court concludes that the $25,000 payment to Ashli was in settlement

21

of a claim to a portion of decedent's estate and did not represent a personal obligation owed by

22

decedent at the time of his death.  The following facts and evidence compel this conclusion.

23

First, the claims in the state court action sought inheritance to which Ashli believed she

24

was entitled, not any amount that the decedent owed her before his death.  It is undisputed that in

25

26

27

28

---

[12]  Defendants spend much of their opposition brief recounting the relationship between Jannise and her attorneys.  (Doc. No. 32 at 13–14.)  Defendants maintain that they did not know that the $25,000 would be used to pay Jannise and Ashli's attorneys and that they "were simply complying with the settlement agreement."  (*Id.* at 14.)  The court finds these various factual assertions to be irrelevant to the determination of whether the $25,000 payment was made in settlement of a claim against the estate.

16

1  the state court action, Jannise and Ashlie sued defendants Allison and Wilson as co-trustees of

2  decedent's trust seeking a determination that certain real and personal property of decedent's

3  belonged to Jannise and Ashli.  (Doc. Nos. 27 at ¶ 28; 27-3 at 1; 29-1 at 1.)  As the settlement

4  agreement in that case explains, the state court action sought a declaration of rights concerning

5  different categories of decedent's property, including real property, a vehicle, and multiple bank

6  accounts.  (Doc. No. 27-3 at 1.)  The parties ultimately settled their disputes "regarding all

7  property ever owned, claimed, or possessed by Decedent, including but not limited to all assets

8  properly included in Decedent's gross estate on the federal estate tax return (Form 706) to be filed

9  as a result of his death . . . ."  (*Id.*)  The settlement agreement proceeds to divvy up "distributions"

10 to Jannise, Ashli, and the trust by allocating portions of real property, personal property, and cash

11 to each, including the $25,000 payment to Ashli.  (*Id.* at 2.)  In difficult-to-read handwritten

12 interlineations, the settlement agreement in the state court action also appears to terminate Ashli's

13 interest in the trust after issuing "a complete distribution."  (*Id.*)  Defendants have also attached a

14 declaration by Jannise and Ashli's attorneys that was filed in the state court action describing that

15 lawsuit as follows:

16     The engagement concerned a controversy over entitlement to the
       assets of Roger Wilson, deceased, ("Decedent") who was a co-
17     habitant of Ms. LAZARUS and the father of ASHLI.  Not long before
       his death, the Decedent gave a power of Attorney to two of his other
18     children (ASHLI is the only child of Decedent and Ms. LAZARUS).
       These children utilized the power of attorney to create an *inter vivos*
19     trust ("trust") ostensibly to effectuate the Decedent's estate plan.
       Based on information and belief, these children had also used the
20     power of attorney to change ownership and pay on death beneficiary
       designations on certain of the Decedent's substantial bank accounts.
21     These actions effectively removed Ms. LAZARUS from succession
       to any of the Decedent's assets and gave the minor a share of the
22     estate far less than what she would have obtained under an equal
       division for all of the Decedent's children.  Pursuant to this
23     engagement, Lang, Richert & Patch filed a petition under Probate
       Code section 850 seeking to determine entitlement to certain real and
24     personal property of the Decedent to both Ms. LAZARUS and for
       the minor.  As the minor is a beneficiary under the trust, Lang,
25     Richert & Patch filed a petition to determine whether a Section 850
       petition would violate the provisions of the trust's no contest clause
26     under Section 21320.

27 (Doc. No. 32-1 at 10.)  Thus, defendants' own exhibits submitted in connection with the pending

28 motion support this court's conclusion that the state court action was filed to establish Ashli's

1   portion of the decedent's estate, not to recover for an outstanding claim representing a personal

2   obligation of the decedent that existed at the time of his death.  *See* 26 C.F.R. § 20.2053-4;

3   *Lindberg*, 927 F. Supp. At 1404 ("Transfers . . . because of disputes between distributees over

4   their respective interests are not deductible.")

5       Moreover, the status of the claimant who received the settlement payment, Ashli, also

6   shows that the claim was made to a portion of the estate.  *See Lindberg*, 164 F.3d at 1319 ("*The*

7   *status of the claimant* is the determinative factor."); *Bank of New York*, 526 F.2d at 1017 ("[T]he

8   courts will determine the nature of the claim for federal tax purposes by examining the particular

9   status of the claimant that enabled him [or her] to impose his [or her] claim on the estate.").  In

10  the original estate tax return, Ashli is identified as a beneficiary of the estate who received

11  $34,000 by care of Jannise.  (Doc. No. 27-1 at 4.)  The docket in the state court action and the

12  settlement agreement both state that part of the claim involved an "Application for Determination

13  that *Beneficiary's* Acts would Not Trigger No-Contest Clause" further showing that Ashli was a

14  beneficiary.  (Doc. Nos. 29-1 at 2 (emphasis added); 27-3 at 1.)  The declaration by Jannise and

15  Ashli's attorneys also shows that Ashli was not only a beneficiary under the trust, but was

16  decedent's child and heir.  (Doc. No. 32-1 at 10.)  Thus, the state court action was predicated on

17  Ashli's status both as a beneficiary under the trust and as decedent's heir since it was alleged that

18  the estate was giving her "a share of the estate far less than what she would have obtained under

19  an equal division for all of the Decedent's children."  (Doc. No. 32-1 at 10.)

20      The foregoing demonstrates that the $25,000 settlement payment made to Ashli was for

21  her claims to a portion of the estate, which are not deductible as claims against the estate.  *See*

22  *Lindberg*, 164 F.3d at 1319 (holding that a payment to settle interference with inheritance claims

23  asserted by decedent's children against a person serving as the estate's personal representative

24  and trustee of decedent's trust were not deductible as claims against the estate); *Condon Nat.*

25  *Bank of Coffeyville, Coffeyville, Kan. v. United States*, 349 F. Supp. 755, 755 (D. Kan. 1972)

26  (holding that a claim by the sister of the decedent's husband to a share of the property received by

27  the decedent under the husband's will was not deductible); *Est. of Lazar v. Comm'r*, 58 T.C. 543,

28  552–53 (1972) (holding that settlement payment for a claim by decedent's nieces challenging a

1  will was not deductible); *Est. of Moore v. Comm'r*, 54 T.C.M. (CCH) 1167 (T.C. 1987) (holding

2  that settlement payment in connection with a will contest was not deductible).

3        Finally, defendants have failed to establish that there are any material disputed facts in this

4  regard.  Moreover, defendants did not carry their burden to rebut the  presumption of correctness

5  to which plaintiff is entitled or establish that they were entitled to the claimed deduction.  *See*

6  *Stephens*, 185 F. Supp. 2d at 1126; *Stevedoring Servs. of Am. v. Comm'r*, 166 F.3d 1218 (9th Cir.

7  1999) ("The taxpayer has the burden of proving that it is entitled to a claimed deduction.").

8  Defendants' main argument is that the state court action was based on "oral agreements between

9  Decedent and Jannise" and that "[c]ontract claims are deductible from the gross value of the

10 estate."[13]  (Doc. No. 32 at 3, 15.)  However, to constitute a deductible contract claim, it must be

11 "*bona fide* and for an adequate and full consideration in money or money's worth."  26 C.F.R. §

12 20.2053-4.  In addition, intra-family agreements are scrutinized closely by courts due to their

13 potential for abuse.  *See Est. of Huntington v. Comm'r*, 16 F.3d 462, 466 (1st Cir. 1994)

14 ("[T]ransactions among family members are subject to particular scrutiny, even when they

15 apparently are supported by monetary consideration, because that is the context in which a

16 testator is most likely to be making a bequest rather than repaying a real contractual obligation.").

17 Thus, even a "valid contract is not necessarily enough . . . to establish a deductible claim for

18 purposes of section 2053." *Id.* at 468.  Here, defendants have failed to present any evidence

19 showing that the purportedly "oral" or "implied" agreement was supported by "adequate and full

20 consideration in money or money's worth."  26 U.S.C. § 2053(c)(1)(A); *see also Est. of*

21 *Huntington*, 16 F.3d at 465 (disallowing a deduction of a settlement payment to sons who did not

22 receive inheritance after decedent-stepmother died intestate and the sons failed to produce

23 _____

24 [13]  Although not mentioned in defendants' opposition, attached as an exhibit to their opposition to
the pending motion is a declaration from defendants' own attorneys in the state court action.

25 (Doc. No. 32-1 5–6.)  In that declaration, defendants' then-attorneys described the allegations of
Jannise to include, among other things, that "[t]here was an implied contract between the

26 decedent and Jannise, whereby Jannise would care for the decedent during the last months of his
life, and in exchange the decedent would leave the Family Home 50% to Jannise and 50% for

27 Ashli." (Doc. No. 32-1 5–6.)  Thus, on one hand defendants assert the basis of the claim was "oral
agreements," but the evidence before this court also reflects that the claim may have been based

28 on an "implied contract."

1    evidence of "give-and-take bargaining" between their deceased father and stepmother

2    establishing a contract to execute reciprocal wills); *Est. of Dauer v. Comm'r*, 39 T.C.M. (CCH)

3    191 (T.C. 1979) (disallowing a deduction for a claim by a stepfather that decedent had promised

4    to repay amounts for college tuition and personal expenses when the only evidence of *bona fide*

5    agreement was testimony that the decedent told the stepfather that he was "grateful" and that he

6    would repay the stepfather "when he had the opportunity" or "when the time comes").

7            Accordingly, the undersigned concludes that there is no evidence before this court on

8    summary judgment suggesting that the $25,000 payment was in settlement of a claim against the

9    estate.  Therefore, it is not deductible from the taxable estate under 26 U.S.C. § 2053(a)(3).

10           Based on the undisputed evidence before the court on summary judgment as outlined

11   above, the court concludes that the $35,000 cashier's check should be included in the decedent's

12   gross estate and that the $25,000 settlement payment is not deductible from the decedent's taxable

13   estate.  Accordingly, the court will grant summary judgment in favor of the plaintiff as to these

14   two claims and issues raised therein.

15   **B.      Defendants' Personal Liability**

16           1.      Defendants' Personal Liability Under 26 U.S.C. § 6324(a)(2)

17           The executor is primarily responsible for paying the estate tax.  26 U.S.C. § 2002.  The

18   property included in the gross estate is encumbered by a lien to secure payment of the tax.  26

19   U.S.C. § 6324(a).  In addition, personal liability is imposed on certain individuals as to certain

20   specified property.  *Id.*  As 26 U.S.C. § 6324(a)(2) provides, in part:

21              If the estate tax imposed by chapter 11 is not paid when due, then the
22              spouse, transferee, trustee . . . or beneficiary, who receives, or has on
                the date of the decedent's death, property included in the gross estate
23              under sections 2034 to 2042, inclusive, to the extent of the value, at
                the time of the decedent's death, of such property, shall be personally
24              liable for such tax.

25   26 U.S.C. § 6324(a)(2).  In other words, if the estate tax is not paid when due, § 6324(a)(2)

26   imposes personal liability on all persons who receive or are in possession of property that was

27   included in the decedent's gross estate under 26 U.S.C. §§ 2034–2042, to the extent of that

28   property's value at the time of the decedent's death.  *See id.*; *United States v. Johnson*, 920 F.3d

639, 645 (10th Cir. 2019) ("Under § 6324(a)(2), a person who holds or receives property included in a decedent's gross estate is personally liable for the estate tax to the extent of the date-of-death value of the property received."); *United States v. Geniviva*, 16 F.3d 522, 524 (3d Cir. 1994) ("26 U.S.C. § 6324(a)(2) imposes liability on the transferees of a decedent's estate when the estate itself fails to pay its federal taxes.").

One type of property interest included in decedent's gross estate are those where the decedent maintained some control over the property before death. *See* 26 U.S.C. 2038(a)(1). A revocable living trust is one example of a property interest in which the decedent maintains control over the property in the trust before death. *See United States v. Paulson*, 331 F. Supp. 3d 1066, 1081 (S.D. Cal. 2018) (internal quotations omitted) ("The particular nature of a revocable living trust allows a settlor to retain an unlimited right to revoke any conveyance to the revocable living trust."). It follows then that the property held in a decedent's revocable living trust is included in a decedent's gross estate under 26 U.S.C. § 2038(a)(1). *See Est. of Bowgren v. Comm'r*, 105 F.3d 1156, 1160 (7th Cir. 1997) ("Section 2038(a)(1) requires inclusion of the value of the property transferred in trust in the settlor's gross estate . . . ."). Moreover, the trustees to the trust receive the trust property when the decedent dies. *See United States v. Johnson*, No. 2:11-cv-00087, 2013 WL 3924087, at *5 (D. Utah July 29, 2013) ("[C]ase law supports that personal liability for an estate tax does not typically extend to trust beneficiaries because it is the trustee who receives the property on the date of a decedent's death."); *Garrett v. Comm'r*, 67 T.C.M. (CCH) 2214, at *15 (T.C. 1994) ("[T]rustee[] was personally liable for the payment of the Federal estate tax under section 6324(a)(2). It was the trustee who received the property included in the decedent's gross estate and it had the legal title, control, and possession of such property.").

As such, when trustees hold decedent's trust property at death and that property is included in the decedent's gross estate under 26 U.S.C. § 2038, the trustees are personally liable up to the value of trust property under 26 U.S.C. § 6324(a)(2). *See, e.g.*, *Paulson*, 331 F. Supp. 3d at 1082 (granting the government's motion for summary judgment on its 26 U.S.C. § 6324(a) claim when there was no disputed issue of material fact with regard to whether the trustee held trust property at decedent's death and that the property was included in decedent's gross estate

21

1   under 26 U.S.C. § 2038); *Johnson*, 2013 WL 3924087, at *9 ("[T]he Trustees fall within the

2   scope of section 6324(a)(2) to the extent of the value of the property in the trust at the time of the

3   Decedent's death."); *Schuster v. Comm'r*, 312 F.2d 311, 315, 317–18 (9th Cir. 1962) (noting that

4   a trustee would be personally liable under the statutory predecessor of § 6324(a)(2), but

5   ultimately ruling in favor of trustee due to an equitable interest "so compelling" and the trustee's

6   loss being "so unwarrantable").[14]

7       Plaintiff argues that defendants Allison and Wilson are personally liable in their capacity

8   as trustees up to the amount of property decedent transferred to the trust before his death—i.e.,

9   $518,750.  (Doc. No. 29 at 14.)  Plaintiff contends that prior to decedent's death, he created the

10   trust and transferred the property to defendants Allison and Wilson as trustees on or about

11   November 12, 2005.  (*Id.*)  Quoting from the estate tax return, (Doc. No. 27-1), plaintiff argues

12   that the estate tax return reported the $518,750 as a transfer "includible in the gross estate under

13   section 2035(a), 2036, 2037, or 2038."  (Doc. No. 29 at 14.)  Specifically, plaintiff claims that the

14   value of the property transferred to the trust was includable in the gross estate under 26 U.S.C. §

15   2038.  (*Id.*)  Because all of the property in the trust and estate has been distributed, plaintiff

16   contends that defendants Allison and Wilson are thus personally liable.  (*Id.* at 13.)

17       In opposition, defendants do not materially contest plaintiff's position regarding personal

18   liability.  (Doc. No. 32 at 14.)  Defendants instead make the following assertions:  that defendants

19   Allison and Wilson were and continue to be trustees and served as executors; that all property in

20   the trust and estate has been distributed; that "[a]ll taxes owed have already been paid"; that all

21

22   [14]  As explained by one commentator, a trustee is liable for unpaid estate tax up to the value of the
trust property even when the unpaid tax is generated from non-trust property:

23

24         the trustee of an *inter vivos* trust which terminates at or after the
grantor's death cannot distribute such property with any assurance
that he will not later be subjected to personal liability, up to the full

25         amount that had been in the trust, for an estate tax deficiency arising,
perhaps, not out of the transfer in trust, but out of other transactions

26         of the decedent of which the trustee may have had no knowledge or
means of knowledge.

27

28   William T. Plumb, Jr., *Federal Liens and Priorities-Agenda for the Next Decade III*, 77 Yale L.J.
1104, 1119 (1968).

1    taxes owed according to the estate tax return have been paid; and that defendants "have met their

2    legal obligation to pay owed taxes." (*Id.*)  Defendants fail to argue that there should not be

3    personal liability and instead merely and repeatedly assert that, in fact, all taxes owed have been

4    paid. (*Id.*)

5            Here, the following undisputed facts before the court on summary judgment establish that

6    defendants Allison and Wilson are personally liable up to the value of the trust property at

7    decedent's death.  It is stipulated by the parties that just over two weeks before decedent's death,

8    on or about November 12, 2005, "the Decedent created a revocable *inter vivos* trust known as the

9    Roger L. Wilson Revocable Trust (the Trust)." (Doc. No. 27 at ¶ 5.)  It is also stipulated by the

10   parties that defendants Allison and Wilson "were and continue to be the two co-trustees of the

11   Trust." (*Id.* at ¶ 6.)  It is further stipulated that decedent transferred $518,750 in property value to

12   the trust. (*Id.* at ¶ 10.)  As provided in the estate tax return,[15] it is undisputed that the value of the

13   trust at decedent's death—$518,750—was included in the decedent's gross estate as a "[t]ransfer

14   includible under section 2035(a), 2036, 2037, or 2038." (Doc. No. 27-1 at 14.)  The estate tax

15   return further provides that all the property included in the trust was received by defendants

16   Allison and Wilson as trustees through quit claim deeds on November 18, 2005, nine days before

17   decedent's death. (*Id.* at 14–17.)  Finally, it is stipulated by the parties that there was an

18   assessment of unpaid estate tax liability. (Doc. No. 27 at ¶ 14.)

19           Accordingly, based upon these undisputed facts, the court concludes that pursuant to 26

20   U.S.C. § 6324(a)(2) defendants Allison and Wilson are personally liable for unpaid estate tax

21   liabilities up to the value of property held in the decedent's trust at the time of decedent's death,

22   which was $518,750.

23   /////

24   /////

25   /////

26

27   [15] The estate tax return was attached as an exhibit to the parties' joint statement of stipulated
     facts. (Doc. Nos. 27 at ¶ 8; 27-1.)  It is also stipulated by the parties that defendants Allison and
28   Wilson filed the estate tax return on behalf of the estate. (Doc. No. 27 at ¶ 7.)

1        2.      <u>Defendant's Personal Liability Under 31 U.S.C. § 3713(b)</u>

2         Plaintiff also asserts that defendants Allison and Wilson are personally liable for unpaid

3 estate tax liability under 31 U.S.C. § 3713(b).[16]  (Doc. No. 29 at 14–15.)  This statute is known as

4 the federal priority statute.  It requires that "[a] claim of the United States Government shall be

5 paid first when the estate of a deceased debtor, in the custody of the executor or administrator, is

6 not enough to pay all debts of the debtor."  31 U.S.C. § 3713(1)(B).  "[T]he federal priority

7 statute imposes personal liability on representatives of an estate who fail to honor a priority claim

8 of the government."  *United States v. McNicol*, 829 F.3d 77, 81 (1st Cir. 2016) (citing 31 U.S.C. §

9 3713(b)).  The personal representatives of a debtor's estate are personally liable under 31 U.S.C.

10 § 3713(b) when the personal representative:  (1) transfers the estate's assets before paying a claim

11 of the United States; (2) effects a transfer of the estate's assets when the indebted estate is

12 insolvent; and (3) "had knowledge of the debt owed by the estate to the United States or notice of

13 facts that would lead a reasonably prudent person to inquire as to [its] existence."  *Id.* at 81–82.

14 "A party seeking relief from such personal liability bears the burden of showing that these

15 requirements (or, at least, one of them) have not been satisfied."  *Id.* at 81 (citing *Bramwell v.*

16 *U.S. Fid. & Guar. Co.*, 269 U.S. 483, 487 (1926)).

17         Plaintiff largely contends that the same undisputed facts addressed in the previous section

18 of this order with respect to the co-trustees' personal liability under 26 U.S.C. § 6324(a)(2)

19 dictate the same result here.  (Doc. No. 29 14–15.)  Defendants merely assert—*verbatim*—the

20 same assertions they raised in response to the plaintiff's 26 U.S.C. § 6323(a)(2) claim of their

21 personal liability.  (Doc. No. 32 at 15.)

22         As to this issue, however, the court concludes that the evidence presented on summary

23 judgment is insufficient to establish that all the necessary elements to plaintiff's 31 U.S.C. §

24 3713(b) claim.  Although it is stipulated by the parties that "[a]ll the property of the Trust and the

25 Estate has been transferred or distributed," (Doc. No. 27 at ¶ 11), there is no evidence before the

26

---

27 [16] "A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the

28 extent of the payment for unpaid claims of the Government."  31 U.S.C. § 3713(b).

court as to when those distributions took place.  Thus, because the government issued the additional assessment in 2010, (Doc. No. 27 at ¶ 14), the government as the plaintiff in this action must establish that defendants Allison and Wilson made distributions depleting the estate with knowledge of that outstanding assessment.  Plaintiff has failed to do so.  Given this absence of evidence, the court concludes that plaintiff has not established it is entitled to judgment as a matter of law under 31 U.S.C. § 3713(b).

Based on the undisputed evidence before the court on summary judgment outlined above, the court concludes that defendants Allison and Wilson are personally liable up to $518,750 under 26 U.S.C. § 6423(a)(2) but that the plaintiff has failed to establish it is entitled to judgment as a matter of law under 31 U.S.C. § 3713(b).  Thus, the court will grant summary judgment in favor of the plaintiff on its claims under § 6432(a)(2) and deny summary judgment in favor of the defendants as to plaintiff's claim brought under § 3713(b).

## CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion for partial summary judgment (Doc. No. 29) is granted as follows:

    a. the $35,000 cashier's check is included in the gross estate;

    b. the $25,000 settlement payment is not deductible from the gross estate; and

    c. defendants Allison and Wilson are personally liable for unpaid estate taxes up to the value of the trust at decedent's death, which is $518,750.

2. Plaintiff's motion for partial summary judgment (Doc. No. 29) is denied as to the imposition of personal liability on defendants Allison and Wilson under 31 U.S.C. § 3713(b).

/////

/////

/////

/////

/////

3.      The parties are directed to contact Courtroom Deputy Mamie Hernandez at (559) 499-5652 or MHernandez@caed.uscourts.gov, within fourteen days of service of this order regarding the scheduling of the Final Pretrial Conference and Jury Trial dates in this action.

IT IS SO ORDERED.

Dated:   **February 24, 2022**                    _Dale A. Drozd_____

UNITED STATES DISTRICT JUDGE